UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ANDREW HALL,<br><br>Plaintiff,<br><br>v.<br><br>LORETTANN GASCARD and NIKOLAS GASCARD,<br><br>Defendants. | Docket No. 1:16-cv-<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

<u>NOW COMES</u> Plaintiff **ANDREW HALL**, by and through his attorneys Zukerman Gore Brandeis & Crossman, LLP and Gallagher Callahan & Gartrell P.C., as and for his **COMPLAINT** against defendants **LORETTANN GASCARD** and **NIKOLAS GASCARD**, hereby sets forth the following:

<u>**INTRODUCTION**</u>

1.  This action revolves around a prolonged and fraudulent scheme perpetrated by defendants, jointly and in concert, on plaintiff Andrew Hall ("Hall"), a well-known collector of post-war and contemporary art. Over a two-year period, Hall purchased twenty-four works of art from defendants, some directly, others through auction houses to which they consigned these works, but all identified as being painted by the artist Leon Golub. In 2015, as he prepared to exhibit these artworks along with other Golubs he owned, Hall discovered that the artworks he purchased from defendants were all forgeries, none of them painted by Golub. By this action, plaintiff seeks to recover in damages for, among other things, defendants' fraud, Hall's cost of acquiring these forged works, the cost incurred in preserving, storing and preparing to exhibit

them to the public, statutory attorneys' fees and treble damages as authorized by statute, as well as statutory interest and enhanced compensatory damages.

## THE PARTIES

2.      Plaintiff Hall is a natural person, a citizen of the State of Florida, residing principally in Palm Beach.  Hall is a well-known art collector, who through the Hall Art Foundation (the "Hall Art Foundation) makes available postwar and contemporary art works from his collection and from the collection of the Hall Art Foundation for the enjoyment and education of the public.

3.      Defendant Lorettann Gascard ("Gascard") is a natural person who is a citizen of the State of New Hampshire.  Gascard resides, upon information and belief, at 348 Route 202, Rindge, New Hampshire.  Upon information and belief, Gascard was until recently an Associate Professor of Art History and Fine Arts at Franklin Pierce University, also in Rindge, New Hampshire, and the Director of the Thoreau Art Gallery at Franklin Pierce University.  Gascard is also an artist in her own right.

4.      Defendant Nikolas Gascard ("N. Gascard") is a natural person who is a citizen of the State of New Hampshire.  N. Gascard resides, upon information and belief, at 56 Concord Road, Peterborough, New Hampshire.  N. Gascard is the adult son of Gascard. (Henceforth, Gascard and N. Gascard will be referred to collectively as "the Gascards.")

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C.§1332(a) because it is between citizens of different states, and the amount in controversy exceeds $75,000.00 exclusive of costs and interest.

6.	Venue is properly laid in this judicial district pursuant to 28 U.S.C.§1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district.

**THE FACTS**

7.	Born in Chicago, Illinois in 1922, Leon Golub ("Golub") worked as an artist, activist, writer and teacher until he died in New York City in 2004.  He received a Bachelor of Arts degree from the University of Chicago and Bachelors of Fine Arts and Master of Fine Arts degrees from the School of the Art Institute of Chicago. Known for creating expressive figurative paintings that explore man's relationship with the dynamics of power, Golub's work has been featured in numerous solo exhibitions throughout the United States and abroad.  He was a member of the American Academy of Arts and Letters and a 1996 recipient of the Hiroshima Art Prize (together with his wife, the artist Nancy Spero).

8.	Golub's work has long been represented in many of the world's most important art museums and public art collections, among them, the Metropolitan Museum of Art, the Art Institute of Chicago, the Israel Museum, the Boston Museum of Fine Arts, the Carnegie Museum of Art, the Corcoran Gallery of Art, the Fogg Museum at Harvard University, the Tate Modern and the Whitney Museum of American Art. Golub's work is also represented in important private collections, including The Broad Art Foundation.

9.	In 2003, shortly before Golub died, Hall began acquiring Golub works from a variety of sources.  He did so in the belief that history would recognize Golub as an important artist, that Golub's work had not yet attained the level of celebration it deserved, and that it was undervalued but likely to increase as art world constituencies discovered Golub's body of work. By 2009, Hall had acquired approximately forty Golub paintings and drawings.  As set forth in more detail below, over the next two-year period commencing with the September 23, 2009

3

Christie's auction discussed in the next paragraph, Hall acquired twenty-four more works of art, all reputed to have been painted by Golub, from the Gascards, directly or indirectly. Years later, in 2015, as Hall prepared to exhibit much of his collection of Golub artworks, he discovered that all of the works he acquired from the Gascards were forgeries. None of them were painted by Golub.

### The Works Acquired by Hall from the Gascards, Directly or Indirectly

10. A painting called *Untitled*, attributed to Golub and said to have been painted *circa* 1980, was offered on September 23, 2009 at the Christie's New York Post-War and Contemporary Art Sale. The listed provenance for the work provided that it had been "acquired directly from the artist by the present owner." Hall acquired *Untitled* at the Christie's auction for the price of $47,500, including premiums. It is now understood, upon information and belief, that this work was consigned to Christie's by one or both of the Gascards, who told Christie's that they acquired the work from the artist knowing that such representations would be used as the work's provenance. *Untitled* was not painted by Golub. It is a clever forgery.

11. Hall acquired three more works attributed to Golub in the Christie's New York Post-War and Contemporary Art Sale, in March, 2010. Each of the three works, *Untitled (triptych)*(circa 1970)*, Untitled (*circa 1970*) and Untitled (*circa 1970*) bore similar descriptions of its provenance; each of these three works was described as having been "Acquired directly from the artist by its previous owner, 1970" and "by descent to the present owner." Hall paid the aggregate amount of $75,000 for these three works, including premiums. It is now understood, upon information and belief, that these works were consigned to Christie's by one or both of the Gascards, who told Christie's that they acquired the works from the artist knowing that such

4

representations would be used as each work's provenance. None of the works were painted by Golub. All are clever forgeries.

12. A late work attributed to Golub was listed for auction in the Sotheby's Contemporary Art Sale held in New York in September 2010. The work, entitled *Two Heads*, was described by Sotheby's as "Private Collection, Berlin (acquired directly from the artist); By descent to the present owner." Hall acquired *Two Heads* at the Sotheby's auction for $31,250, including the buyer's premium. It is now understood, upon information and belief, that this work was consigned to Sotheby's by one or both of the Gascards, who told Sotheby's that they acquired the works from the artist knowing that such representations would be used as each work's provenance. However, this work was not painted by Golub. It is a clever forgery.

13. Hall acquired two additional works attributed to Golub in the Christie's New York First Open Post-War and Contemporary Art Sale held in March 2011. Like the works described above, these works, *Welcome To It* and *Two Black Heads*, were described as having been "acquired directly from [the] artist by the present owner." Hall acquired these works at the auction for the aggregate price of $53,750. It is now understood, upon information and belief, that these works were consigned to Christie's by one or both of the Gascards, who told Christie's that they acquired the works from the artist knowing that such representations would be used as each work's provenance. However, these works were not painted by Golub. They are clever forgeries.

14. During this same period, in about January, 2011, Hall and/or his agents made first direct contact with N. Gascard as the result of another ostensible Golub work that was listed by the Gascards for online auction on the online auction house Artnet.com. In that transaction, Hall acquired a putative Golub painting entitled *Untitled (Mercenary)* for the total price of $28,750.

After this transaction was complete, Hall and/or his agent communicated directly with N. Gascard to arrange payment and shipping. This work was not painted by Golub, and is instead a clever forgery.

15. N. Gascard communicated to Hall that Gascard had a collection of Golub and Nancy Spero works, among others, which they wished to sell. N. Gascard proceeded to offer Hall a number of other ostensible Golub works from his own collection and that of Gascard. Hall ultimately acquired a number of these works, as set forth below.

16. Following the January 2011 transaction, the Gascards offered to arrange the sale of other Golub works allegedly owned by N. Gascard. The provenance of the offered works was described by N. Gascard as having been "acquired directly from the artist and have come into the possession of the current owner (Nikolas Gascard) by descent." In March, 2011 Hall acquired ten alleged Golubs: *Colossus Head (*circa 1963*), Colossus Head (*circa 1963*), Three Heads (*circa 1980*), Black Figure (Horsing Around) (*circa 1980*), Torture (Interrogation (*circa 1980*), Napalm Flag (*circa 1969*), Flag – Try Burning This One (*circa 1980*), Napalm Head (*circa 1969*) Mercenary (*circa 1979*) and Heretic's Fork* (circa 1980) for an aggregate purchase price of $275,000. It is now understood, upon information and belief, that these none of the eleven works acquired from N. Gascard were painted by Golub. They are clever forgeries.

17. In October 2011, in a transaction brokered by N. Gascard, Hall purchased six more putative Golub works from Gascard herself: *Two Heads (Night Scene) (*circa 1988*), Colossal Heads (*circa 1963*), Two Heads (*circa 1988*), Head With Gun (*circa 1980*), Mercenary Figure (*circa 1980*) and Mercenary Head (*circa 1980*)*, for the aggregate purchase price of $165,000. The provenance of these acquired works was described as being "acquired directly from the artist." Prior to this acquisition, N. Gascard had shown Hall images of nine additional

supposed Golubs, though by email dated October 23, 2011, N. Gascard wrote to Hall to report that three of these other works had been sold. These works were not painted by Golub and were not acquired by Gascard from Golub. As with all of the other works described above, they are clever forgeries.

### Hall Begins to Discover that the Works Acquired from the Gascards are Fakes

18. In November 2014, the Hall Art Foundation began planning an exhibition of all the Golub paintings Hall had collected, to be held at its Reading, Vermont exhibition space (the "Reading Exhibition"). The intention was to mount a serious and comprehensive Golub exhibition, which would display over 60 Golub works spanning Golub's career from 1953 to 2002, including all or most of the 24 putative Golub paintings acquired from the Gascards as described above. In the course of planning the Reading Exhibition, the Hall Art Foundation spoke to Gascard about the provenance of the Golub works she had sold to Hall; among other things, she told the Hall Art Foundation that some of the works were gifts or purchases from Golub to her and/or late husband, Johannes, and some were acquired upon the death in Germany of Johannes' sister, Mikaela Gascard. Gascard added that she first met Golub when she attended art classes he taught at Fairleigh Dickinson University between 1968 and 1970 after which they developed a very close friendship that lasted until his death. The Reading Exhibition was scheduled to open on or about May 9, 2015 and was to be accompanied by a catalogue of the Golub works exhibited.

19. As part of its routine preparation for the Reading Exhibition, the Hall Art Foundation asked The Nancy Spero and Leon Golub Foundation for the Arts (the "Golub Foundation") if it would help to confirm the exact titles and dates of all of the works that would be included in the Reading Exhibition. The Golub Foundation, named after Golub and his late

wife Nancy Spero (also a well-known artist), was organized for the purpose, among other things, of promoting the legacy of Golub and Nancy Spero, and is affiliated with some of the most eminent scholars of Golub's artworks in the world. The children of Golub and Spero are also closely involved on the Board of the Golub Foundation, in order to protect their parents' artistic legacy and the value of Golub and Spero artworks.

20. By email dated February 2, 2015, the Golub Foundation – represented by Golub's son, Professor Stephen Golub -- agreed to provide the assistance requested, and assigned its assistant Samm Kunce ("Kunce"), herself a noted visual artist and longtime studio assistant to Golub, to the task. The Hall Art Foundation in turn sent Kunce and the Golub Foundation images and documentation about each work proposed for the Reading Exhibition.

21. While Kunce was readily able to provide the information requested for many of the works proposed for the Reading Exhibition, she raised red flags about all, or virtually all, of the works acquired from, or through the Gascards. There was no record of these works in the Golub Foundation's extensive inventory database, and Kunce noted a number of unusual formal characteristics during in-person examinations of the paintings. In an email to the Hall Art Foundation dated March 28, 2015, Professor Golub wrote, among other things, that may of the works were "likely forgeries," adding the following:

> It seems that the bulk of the questionable works originate from Lorettann Gascard, who claims to have been close to Leon [Golub]. In addition to the works themselves being problematic, as judged by Samm [Kunce] directly and others among us who have viewed images, there are other circumstances that raise questions about their authenticity. My brothers and I have no recollection of ever meeting or even hearing about Ms. Gascard. Our parents, and Leon in particular, were quite gregarious and their friends frequently came to our residence for dinner, so it's surprising that we have never heard of Gascard. Moreover, some research by Samm and my brother Paul [Golub] showed that some of the supposed Golubs acquired by Hall were put up at auction simultaneously with Gascard's own works.

8

22.     On the basis of this alarming news, the substance of which was conveyed several days before the March 28, 2015 email, the Hall Art Foundation cancelled the Reading Exhibition and began making further inquiries.  First, they sought Gascard's assistance to prove the genuineness of the challenged works; Gascard agreed, but ultimately produced only a February 2, 2002 letter, ostensibly from Golub to Gascard thanking her for having sent him an article but making no mention of any artworks, and a March 3, 2003 letter, ostensibly from Nancy Spero to Gascard thanking her for the gift of earphones and sending best wishes.  She sent nothing about any of the ostensible Golub works at issue here, and despite her agreement to do so, she has sent nothing since.  In fact, she has refused to offer any further documentation or evidence that any of the works purchased from or through her or her son are genuine Golubs.

23.     In one communication, the Hall Art Foundation emailed Gascard on March 25, 2015, to seek Gascard's confirmation that the works acquired at Christie's auctions were from Gascard's own collection.  Gascard never replied.

24.     On another occasion, the Hall Art Foundation sought to verify Gascard's information that one of the putative Golubs purchased from the Gascards was related to a famous work of art by the photographer Andres Serrano.  On behalf of the Hall Art Foundation, Kunce wrote to Serrano to obtain his confirmation of this.  Serrano wrote back that the statement was false, that in fact he had never seen the alleged Golub painting that was said to have inspired his photograph.

25.     Hall and the Hall Art Foundation asked other persons expert in Golub's work to examine the paintings, including at least one person who had been Golub's art dealer.  All such persons expressed grave doubt that the works were genuine.

26. Finally, the Hall Art Foundation, through its Director, Maryse Brand ("Brand") journeyed to Washington D.C. to go through Golub's archives, which had been donated to the Archives of American Art at the Smithsonian Institution.  Golub was understood to be a copious record keeper, who kept detailed records of all of his artworks, and who also maintained a voluminous correspondence with friends and other persons in the art world.  Brand spent days going through Golub's papers, and found no mention of any of the ostensible Golub works discussed above (collectively, the "Challenged Works") and scant, if any, mention of Gascard, despite her claim of a decades-old close personal friendship with Golub and Nancy Spero.

27. Nor has Hall been able to confirm Gascard's subsequent account of having acquired some of the Challenged Works on the death in Hamburg, Germany of her sister-in-law Mikaela Gascard.  Though Hall was able to confirm that a Mikaela Gascard did exist, no evidence that she owned Golub artworks or left them to Gascard, her late husband or N. Gascard was located.

28. Under all the circumstances, it is clear that the Challenged Works were not genuine works of art created by Golub, that all of the representations made by either of the Gascards as to how any of the Challenged Works were acquired were knowingly false when made, that Gascard's accounts of her close relationship with Golub and Nancy Spero were false, and that the Challenged Works, including those acquired at auction through Christie's and Sotheby's, were all forgeries.

**FIRST CLAIM FOR RELIEF**
(Fraud)

29. Hall repeats and re-alleges each and every allegation contained in paragraph nos. 1 through 28 as if fully set forth herein.

10

30. By reason of the foregoing, the Gascards, individually and in concert, have defrauded Hall. As set forth above, the Gascards represented that the Challenged Works, and each of them, were original paintings by Golub when they were in fact forged.

31. Hall would not have purchased the Challenged Works, or any of them, had he known the true state of facts. The authenticity of each of the Challenged Works was clearly material to Hall's decision to purchase each one.

32. Hall has been damaged thereby in an amount to be determined at trial, but in no event less than the six hundred seventy-eight thousand dollars ($676,250.00) purchase price for the Challenged Works, as well as the costs expended by Hall in discovering that the Challenged Works were forged, and attorneys' fees.

## SECOND CLAIM FOR RELIEF
(Conspiracy to Defraud)

33. Hall repeats and re-alleges each and every allegation contained in paragraph nos. 1 through 32 as if fully set forth herein.

34. Each of the Gascards conspired with the other to defraud Hall. As set forth above, each of the Gascards told Hall that the Challenged Works that each was seeking to sell to Hall was a genuine Golub painting, that such paintings were gifted to the Gascards or purchased by them directly from Golub or left to each of them in the will of Mikaela Gascard, that Gascard was a longtime and close personal friend of Golub, and that Gascard would provide evidence demonstrating the authenticity of each of the Challenged Works. In essence, each of the statements each of the Gascards made to Hall in their effort to sell the Challenged Works to Hall, was false.

35. Each of the Gascards' statements to Hall was intended to buttress and corroborate the statements made by the other Gascard as part of a concerted effort by the Gascards to sell the

11

bulk of their collection of forged Golubs to Hall. Each of the Gascards is jointly and severally liable with the other Gascard for Hall' damages here, irrespective of which Gascard posed as seller of any of the Challenged Works.

36. Hall has been damaged thereby, as set forth above.

## THIRD CLAIM FOR RELIEF
### (Breach of Common Law and Statutory Warranties)

37. Hall repeats and re-alleges each and every allegation contained in paragraph nos. 1 through 36 as if fully set forth herein.

38. By reason of the foregoing, the Gascards have breached all of the common law and statutory warranties they gave, expressly or impliedly, to Hall with respect to the Challenged Works. These include, but are not limited to the express warranty by description found in RSA §382-A:2-313(1)(b), the implied warranty of merchantability contained in RSA §382-A:2-314 and the implied warranty of fitness for particular purpose set forth in RSA §382 A:2-315.

39. Hall has been damaged thereby, as set forth above.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract)

40. Hall repeats and re-alleges each and every allegation contained in paragraph nos. 1 through 39 as if fully set forth herein.

41. By reason of the foregoing, the Gascards, and each of them, have breached their every agreement by which Hall acquired the Challenged Works from them, and each of them.

42. Hall has been damaged thereby, as set forth above.

## FIFTH CLAIM FOR RELIEF
### (Unjust Enrichment)

43. Hall repeats and re-alleges each and every allegation contained in paragraph nos. 1 through 42 as if fully set forth herein.

44. By virtue of the foregoing, the Gascards, and each of them, have been unjustly enriched in the amounts each of them received on account of the purchases by Hall of each of the Challenged Works. The Gascards are not entitled, in fairness, to retain any such proceeds.

45. Hall has been damaged thereby, as set forth above.

**FIFTH CLAIM FOR RELIEF**
**(Violation of RSA §358-A)**

46. Hall repeats and re-alleges each and every allegation contained in paragraph nos. 1 through 45 as if fully set forth herein.

47. By virtue of the foregoing, defendants have engaged in the trade or business of selling artwork, and have engaged in deceptive acts and/or practices including, among other things, willfully and knowingly passing off as works of art by Golub works actually by someone else.

48. Hall is entitled to all remedies provided for in RSA §358-A *et seq,* including, but not limited to, treble damages and an award of reasonable attorneys' fees and costs.

**WHEREFORE,** Plaintiff Andrew Hall respectfully requests that this Court:

A. Award compensatory, enhanced compensatory, and treble damages;

B. Award the costs of this action, including reasonable attorney's fees; and

C. Grant such further relief as justice requires.

**JURY DEMAND**

Plaintiff Andrew Hall hereby demands a trial by jury on all claims so triable.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | ANDREW HALL, |
|  | By his attorneys, |
| Dated: September 16, 2016 | /s/ Samantha D. Elliott<br>Samantha D. Elliott (NH #17685)<br>elliott@gcglaw.com<br>GALLAGHER, CALLAHAN &<br>GARTRELL, P.C.<br>214 N. Main Street<br>Concord, NH 03301<br>Tel. (603) 228-1181<br>Fax (603) 224-7588 |
| Dated: September 16, 2016 | /s/ Ted Poretz<br>Ted Poretz<br>*Pro hac vice application to be requested*<br>Florence Beauboeuf<br>*Pro hac vice application to be requested*<br>tporetz@zukermangore.com<br>ZUKERMAN GORE BRANDEIS<br>& CROSSMAN LLP<br>11 Times Square<br>New York, N.Y. 10036<br>Tel. (212) 223-6700 |